UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIONTE DORIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09-cv-3303 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| CITY OF AURORA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dionte Doris, was hired by Defendant, City of Aurora ("Aurora"), as a

probationary police officer. A few days before his probationary term was scheduled to

expire, Doris was terminated for excessive absenteeism. Doris then brought this lawsuit,

alleging two counts under the Family and Medical Leave Act of 1993 ("FMLA"),

codified at 29 U.S.C. § 2601 *et seq.* Count I alleges interference with Doris's

entitlements under the FMLA. Count II alleges that Aurora retaliated against Doris for

asserting his FMLA rights. Both parties moved for summary judgment on both counts.

For the reasons discussed below, both motions are denied.

### BACKGROUND

The following facts are taken from the parties' statements of undisputed material

facts submitted in accordance with Local Rule 56.1.[1]

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to
provide "a statement of material facts as to which the moving party contends there is no
genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each
factual statement proffered by the moving party and to concisely designate any material
facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*,

On December 17, 2007, Aurora hired Doris as an at-will, probationary police officer. (Def. 56.1(a) ¶¶ 3-4.) Like other new Aurora police officers, Doris was hired on a 15-month, probationary basis, during which time he was not covered by a union collective-bargaining agreement. (Def. 56.1(a) ¶ 4.)

Prior to his start date, Doris received a copy of the Aurora Employee Handbook ("Handbook"); he signed a receipt of acknowledgement on December 14, 2007. (Def. 56.1(a) ¶ 5.) Among other things, the Handbook outlined Aurora's policies and procedures regarding the FMLA. (Def. 56.1(a) ¶ 5.) The Handbook does not contain any provision specifically discussing "sick days," and Aurora does not have a policy regarding the number of sick days that may be taken by probationary officers. (Pl. 56.1(b) ¶ 5.) Aurora's police officers are not trained regarding FMLA policies. (Pl. 56.1(b) ¶ 21.)

Pursuant to Aurora's policies, an "Aurora Police Department Absence Report" ("Absence Report") had to be completed any time an officer called in sick. (Def. 56.1(a) ¶ 10.) The bottom portion of the Absence Report, which must be completed and signed by the absent officer upon his return, details the date the officer reported back for duty, the length of absence, the number of days off, and whether the absence was due to injury. (Def. 56.1(a) ¶ 11.) It also includes space for remarks. (Def. 56.1(a) ¶ 11.) If an employee misses more than two days of work, Aurora also requires that employee to provide a "Return to Duty Report" completed by a physician. (Def. 56.1(a) ¶ 13.)

403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Doris called in sick on May 12 and 13, 2008. (Def. 56.1(a) ¶ 10.) He had gone to the emergency room with complaints of testicular pain. (Def. 56.1(a) ¶ 12.) He was diagnosed with epididymitis and was given a prescription antibiotic and a note from the hospital, stating, "No work 5/12 and 5/13, ret[urn] to work 5/14." (Def. 56.1(a) ¶¶ 12-13.) According to Doris's Return to Duty Report, Doris was released to full, unrestricted duty on May 18, 2008. (Def. 56.1(a) ¶ 14.)

On June 12 and 13, 2008, Doris called in sick because his head hurt and he had discharge from his nose, throat, and chest. (Def. 56.1(a) ¶¶ 16-17.) Doris did not see a doctor; he took over-the-counter allergy medication. (Def. 56.1(a) ¶¶ 16-17.) This was the first time he ever experienced any such health problems. (Def. 56.1(a) ¶ 17.) In fact, Doris does not recall having any health conditions severe enough to require a visit to the doctor at any time prior to his being hired as an Aurora police officer. (Def. 56.1(a) ¶ 9.)

Aurora received a Return to Duty Report concerning Doris's absences for these two days, stating that Doris could return to full, unrestricted duty on June 13, 2008. (Def. 56.1(a) ¶ 18.) The report stated that Doris was not taking any medication. (Def. 56.1(a) ¶ 18.) Doris also completed another Absence Report upon his return. (Def. 56.1(a) ¶ 20.) Doris does not recall submitting this paperwork; nor does he know the doctor who completed the Return to Duty Report. (Def. 56.1(a) ¶ 19.)

Sometime between June 2008 and September 2008, Doris had a conversation with then-Sergeant Kristin Ziman, during which Sergeant Ziman expressed concern about his absences and sought an explanation; Doris told her he had a sinus problem. (Def. 56.1(a)

¶ 21.) From June through September, Doris was in fine health and did not experience any further sinus problems. (Def. 56.1(a) ¶ 22.)

Doris again called in sick on September 18, 2008 – his second day of solo patrol. (Def. 56.1(a) ¶¶ 24-25.) Doris completed an Absence Report on September 19, 2008; but he does not recall calling in sick on that date, nor does he recall seeing a doctor. (Def. 56.1(a) ¶¶ 25-26.)

From October 23, 2008, through November 10, 2008, Doris called in sick for each of fifteen scheduled days of work. (Def. 56.1(a) ¶¶ 27, 34.) Each time, he simply said, "I'm not going to be in." (Def. 56.1(a) ¶ 27.) Doris testified he was absent because he started "experiencing like these debilitating headaches." (Def. 56.1(a) ¶ 28.) He also had trouble breathing, spent an entire day vomiting, and was so sensitive to light that sunlight caused pain in his eyes. (Pl. 56.1(b) ¶¶ 7-8.) On October 27, 2008, Doris visited Dr. Richard Krouse, complaining of a headache. (Def. 56.1(a) ¶ 29.) Dr. Krouse referred Doris for a CAT scan. (Def. 56.1(a) ¶ 29.) He also prescribed an antibiotic, a nasal steroid spray (Flonase), and nasal irrigation. (Def. 56.1(a) ¶ 30.) At a follow-up appointment on October 30, 2008, Dr. Krouse diagnosed Doris as having acute sinusitis. (Def. 56.1(a) ¶¶ 30-31.)

Within the first couple of days of his leave, Doris called Sergeant Woods and explained that he was ill, that he was under a doctor's care, that he was suffering from migraine headaches, that he had received a CAT scan, and that he was taking medication. (Pl. 56.1(a) ¶ 28.) Sergeant Woods told him it was not necessary to call him about it. (Def. 56.1(a) ¶ 36.) Prior to that conversation, Sergeant Woods told Lieutenant Ziman

that he was going to talk to Doris about abusing sick time; but once he found out Doris was under the care of a doctor, he decided such a conversation would be inappropriate. (Pl. 56.1(a) ¶ 29.) Doris did not speak to any other supervisors concerning his health at that time, nor did he speak to anyone in Human Resources about it. (Def. 56.1(a) ¶ 37.)

Dr. Krouse completed a Return to Duty Report dated November 7, 2008; the report stated that Doris could return to full, unrestricted duty on November 8, 2008. (Def. 56.1(a) ¶ 32.) The report also noted that Doris was taking Flonase and an antibiotic. (Def. 56.1(a) ¶ 32.) Dr. Krouse signed the report on November 10, 2008. (Def. 56.1(a) ¶ 32.) When Doris returned to duty on November 13, 2008, he completed and signed Absence Reports for each day of his absence. (Def. 56.1(a) ¶ 33.) He left the "remarks" portion of each form blank. (Def. 56.1(a) ¶ 34.)

On December 17, 2008, Doris reached his one-year anniversary of employment and thereby became an "eligible employee" under the FMLA. (Def. 56.1(a) ¶ 38.)

On January 27, 2009, Doris was sent home from work because he was sick. (Pl. 56.1(b) ¶ 12.) He called in sick on January 29, 2009. (Def. 56.1(a) ¶ 41.) He returned to work on January 31, 2009, and completed an Absence Report, indicating (without any remarks) that he was absent for two days. (Def. 56.1(a) ¶¶ 41, 43.) The incident did not require a visit to the doctor – Doris simply self-medicated with Flonase, nasal irrigation, and Tylenol. (Def. 56.1(a) ¶ 42.) Doris did not report the reason for his absences to anyone and did not submit a Return to Duty Report. (Def. 56.1(a) ¶ 43.)

Doris's attendance was fine from January 31, 2009, through February 18, 2009. (Def. 56.1(a) ¶ 44.) During that time, Doris did not consult a doctor or speak with any supervisors about any health issues. (Def. 56.1(a) ¶ 44.)

On February 18, 2009, Doris began experiencing headaches again. (Def. 56.1(a) ¶ 45.) According to Doris, he was "still nauseous, headaches pounding, but not too much stuffing up." (Def. 56.1(a) ¶ 45.) He called in sick the following day and ultimately missed another six days of work. (Def. 56.1(a) ¶ 46.)

On February 23, 2009, Doris went back to see Dr. Krouse and told him that he was experiencing "the same stuff" as he had in November. (Def. 56.1(a) ¶ 47.) Dr. Krouse diagnosed Doris with acute sinusitis and allergic rhinitis (hay fever) and recommended that Doris stay on Flonase daily or get rid of a cat he recently acquired. (Def. 56.1(a) ¶ 48.) Dr. Krouse also gave Doris another prescription for Flonase and recommended that he take an over-the-counter allergy/decongestant and Extra Strength Tylenol. (Def. 56.1(a) ¶ 47.) The follow-up notes on Dr. Krouse's records indicate that Doris was instructed to return if symptoms worsened or failed to improve. (Def. 56.1(a) ¶ 48.) Dr. Krouse completed and signed a Return to Duty Report for Doris on February 26, 2009, releasing Doris to full, unrestricted duty on February 27, 2009. (Def. 56.1(a) ¶ 49.)

Upon his return to work, Doris completed an Absence Report, indicating his six-day absence. (Def. 56.1(a) ¶ 50.) Doris did not speak with any supervisors about the nature of his absence and did not include any remarks on his Absence Report. (Def. 56.1(a) ¶ 50.)

6

On February 25, 2009, Commander Groom emailed Sergeant Dean and Lieutenant Ziman, stating, "Doris has had an abundance of sick time (28 days between 2008 and 2009, with 8 so far this year). This should be relayed through your chain of command and should have been brought forward earlier." (Pl. 56.1(a) ¶ 53.) Commander Groom did not inquire as to the specific cause of Doris's absences. (Pl. 56.1(b) ¶ 25.) He instructed Lieutenant Ziman not to take any disciplinary action before he talked to Chief Thomas because he did not want to constrain the Chief from taking more stringent action. (Pl. 56.1(a) ¶ 55.) Commander Groom then drafted a memorandum to Chief Thomas, recommending that Doris be terminated for missing twenty-eight days – including two extended periods of fifteen and six days, respectively. (Pl. 56.1(b) ¶ 28.)

As he neared the end of his probationary period, Doris became concerned when he heard that a veteran officer had been terminated for excessive absences. (Def. 56.1(a) ¶¶ 51-52.) Doris spoke to another veteran officer, who suggested he speak with his supervising sergeant or send him an email about it. (Def. 56.1(a) ¶ 52.) On March 1, 2009, Doris sent an email to Sergeant Dean (his supervisor at the time), which stated, "I am sure you are aware of the times I have called in sick . . . . As of recent, I have begun to get them again and that is why I have been missing more and more work." (Def. 56.1(a) ¶¶ 53-54.) According to Doris's testimony, "them" referred to sinus problems with severe headaches. (Def. 56.1(a) ¶ 55.) Doris expressed concern to Sergeant Dean regarding the impact of his absences. (Def. 56.1(a) ¶ 55.) He also wrote, "This is a chronic issue diagnosed by my doctor" and stated that he would try to provide

Sergeant Dean with detailed information from his doctor "regarding all sessions and medication given to help [his] issues." (Def. 56.1(a) ¶ 57.)

A day or two later, Sergeant Dean told Doris he had read his email and had not heard anything within his chain of command about Doris's sick time being an issue. (Def. 56.1(a) ¶ 58.) Doris told Sergeant Dean that he had been having headaches and sinus problems and that he had been working with a doctor to try to resolve the issues. (Pl. 56.1(b) ¶ 18.) Doris did not speak to any other supervisory personnel about his concerns of using sick time and did not consult the Handbook with respect to any rights or entitlements he might have under the FMLA. (Def. 56.1(a) ¶ 60.)

On March 10, 2009, Doris received a copy of a letter from Chief Thomas, recommending Doris's termination due to excessive absenteeism. (Def. 56.1(a) ¶ 61.) The letter stated that Doris could request an informal conference with Director of Human Resources Alex Alexandrou within three days of receiving the letter. (Def. 56.1(a) ¶ 61.) Doris did so. (Def. 56.1(a) ¶ 63.) A meeting was then held at which the following persons were present: Doris, Doris's attorney, Alexandrou, LaDonna Carr (Assistant Director of Human Resources), and Commander Groom. (Def. 56.1(a) ¶ 63.)

Prior to the meeting, Doris's attorney sent a letter to Alexandrou, stating that Doris's absences were protected by the FMLA and that Doris had provided medical documentation to Aurora concerning his medical problems and was willing and able to submit additional documentation. (Pl. 56.1(b) ¶ 34.) At the meeting, Doris explained that he had no control over his illness. (Def. 56.1(a) ¶ 64.) After the meeting, Doris's

attorney sent another letter to Alexandrou, summarizing the meeting, Doris's position, and Doris's claimed health condition. (Def. 56.1(a) ¶ 65.)

On March 13, 2009, Alexandrou sent Doris a letter, stating that he fully concurred with Chief Thomas's recommendation and that Doris's employment would be terminated effective March 14, 2009. (Def. 56.1(a) ¶ 65.)

Neither Alexandrou nor anyone else at Aurora contacted Doris's physician before or after the meeting. (Pl. 56.1(b) ¶ 40.) Doris never communicated with Chief Thomas or Commander Groom about his health situation. (Def. 56.1(a) ¶ 67.) With the exception of the informal hearing and one telephone conversation before the hearing, Doris also never spoke with Alexandrou about his health situation. (Def. 56.1(a) ¶ 67.)

Doris never received a written diagnosis from a medical professional indicating that he suffers from chronic debilitating headaches; nor did Dr. Krouse ever tell him that he was suffering from chronic debilitating migraine headaches. (Def. 56.1(a) ¶ 68.) Doris never asked Dr. Krouse to write a letter or contact Aurora on his behalf regarding his condition. (Def. 56.1(a) ¶ 68.)

In his answers to Aurora's interrogatories, Doris stated that he was terminated after providing notification to his supervisors that he was suffering "from debilitating migraine headaches, a chronic condition." (Def. 56.1(a) ¶ 69.) When he was later questioned about that answer in his deposition, Doris admitted that was not true.[2] (Def. 56.1(a) ¶ 69.)

---

[2] Doris asserts that he simply admitted that he was never officially diagnosed with migraine headaches, not that he never experienced such headaches.

Doris only had two episodes of headaches that required a visit to the doctor: one in October 2008 and one in February 2009. (Def. 56.1(a) ¶ 74.) Doris does not now claim he had any medical problems other than sinusitis. (Def. 56.1(a) ¶ 73.) He admits that sinusitis never bothered him before October 2008 or after February 2009. (Def. 56.1(a) ¶ 73.) Although he still gets headaches, they are not bad enough to cause him to miss work or visit a doctor. (Def. 56.1(a) ¶ 73.)

To the best of his knowledge, Doris received sick pay for each day that he called in sick. (Def. 56.1(a) ¶ 20.) Doris is not aware of any Aurora employee who has been denied FMLA leave; nor is he aware of any bias on the part of Chief Thomas, Commander Groom, or Alexandrou against any individual who has taken FMLA leave. (Def. 56.1(a) ¶ 75.)

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The FMLA entitles eligible employees to as many as twelve work weeks of leave during any twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is unlawful for a covered employer to interfere with an employee's attempt to exercise any FMLA entitlements. 29 U.S.C. § 2612(a)(1). It is also unlawful for an employer to retaliate against an employee who exercises FMLA rights. *See* 29 U.S.C. § 2615(a)(2) (prohibiting discrimination against employee who opposes any practice made unlawful by the FMLA). Doris alleges his termination was both an interference with his attempt to exercise an FMLA entitlement and an act of retaliation for making that attempt.

11

*Count I*

To prevail on an FMLA interference claim, an employee must establish the following: (1) that he was eligible for the FMLA's protections; (2) that his employer was covered by the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he provided sufficient notice of his intent to take FMLA leave; and (5) that his employer denied his right to those benefits. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (*Burnett*). No finding of ill intent is required. *Id.*

In this case, it is undisputed that Doris was an eligible employee under the FMLA as of December 17, 2008, and that Aurora is a covered employer. It is also undisputed that the sole reason for Doris's termination was his excessive absenteeism. Thus, only elements (3) and (4) of Doris's interference claim are in dispute.

An employee is entitled to FMLA leave if he is afflicted with a "serious health condition" that renders him unable to perform the functions of his job. *Id.* at 477 (citing 29 U.S.C. § 2612(a)(1)(D)). Whether an illness constitutes a "serious health condition" under the FMLA is a legal question "that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so." *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 1999). It is defined as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Doris does not allege that he received inpatient care for his illnesses. Thus, his ability to prove he had a "serious health

12

condition" depends on his ability to establish that he received continuing treatment by a healthcare provider.

The Department of Labor has issued interpretive regulations, explaining what qualifies as a serious health condition involving continuing treatment by a healthcare provider. Doris argues that the following provision applies to his situation:

> Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
>
> > (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
> >
> > (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> >
> > (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115 (c).

As an initial matter, Doris misapprehends the burden he faces in opposing Defendant's Motion for Summary Judgment. Doris states, "In order to prevail on its motion, Defendant has the burden of proving to this Court that, as a matter of law, Officer Doris did not have a serious health condition." (Pl. Opp'n Br. 8.) That is incorrect. Doris bears the burden of proving his FMLA claims. To succeed on summary judgment, Aurora needs only to demonstrate that the undisputed facts do not allow him to do so. In other words, Aurora must establish that Doris cannot prove that he had a serious health condition.

Nonetheless, when the correct standard is applied and the evidence is viewed in Doris's favor (for purposes of Aurora's Motion for Summary Judgment), a reasonable

jury could conclude that Doris suffered from a chronic case of recurring sinus infections, which required him to visit a doctor twice in a year, continued over a period of more than eight months, and manifested itself in episodic periods of pronounced symptoms. These sinus infections caused Doris to experience nausea, sensitivity to light, difficulty breathing, and debilitating headaches that rendered him incapable of performing the functions of his job. Thus, if Doris's allegations are true, the regulatory requirements are satisfied.

Both times Doris consulted a doctor about his condition, the doctor signed a Return to Duty Report, indicating that Doris was prescribed medication. These reports do not require a physician to state whether the employee was incapacitated as a result of his condition. However, Dr. Krouse later attested that "Doris's sinusitis caused periodic episodes of incapacity due to physical problems resulting from his sinusitis, including headaches that were reported as debilitating."[3]

Aurora argues that acute sinusitis is not a serious health condition as a matter of law, relying heavily on a Department of Labor Regulation, which provides: "Ordinarily, unless complications arise, the common cold, the flu, earache, upset stomach, minor ulcers, headaches other than migraine . . . etc., are examples of conditions that do not

---

[3] Aurora argues that Dr. Krouse's affidavit must be disregarded because it is not notarized and not based on personal knowledge. These arguments are unpersuasive. First, Dr. Krouse's affidavit contains a sworn statement as to its truthfulness that complies with 28 U.S.C. § 1746. It would have been more appropriate to characterize the document as a "declaration," rather than an "affidavit," but this is no reason to disregard it. Second, Dr. Krouse states that his affidavit is based on the medical records he prepared at the time of Doris's visits. His present inability to remember the encounters without the aid of Doris's medical records does not mean that the records are not based on personal knowledge or would be otherwise inadmissible as evidence. *See* Fed. R. Civ. P. 56(e).

meet the definition of a serious health condition and do not qualify for FMLA leave."
29 C.F.R. § 825.113(d). Aurora argues that sinusitis is similar to the common cold and, thus, does not qualify for FMLA leave.

As the Fourth Circuit has observed, however, that regulation simply states that certain conditions *ordinarily* will not qualify; it does not state that those conditions *always* fail to qualify. *See Miller v. AT&T Corp.*, 250 F.3d 820, 831-32 (4th Cir. 2001). Instead, the critical inquiry is whether the condition asserted by the employee meets the regulatory objective criteria for a serious health condition. *Id.* at 832. Typically, the common cold, flu, etc. do not occur chronically and do not require prolonged treatment such that they would otherwise qualify; but that does not mean that these common ailments can *never* rise to the level of seriousness contemplated by the FMLA.

Aurora relies on *Beaver v. RGIS Inventory Specialists, Inc.*, 144 Fed. Appx. 452 (6th Cir. 2005) (*Beaver*), an unpublished Sixth Circuit case where summary judgment was upheld in favor of an employer and against an employee who cited sinusitis as a serious health condition. The Sixth Circuit stated that even if the employee "was suffering from sinusitis, bronchitis and an ear infection at the time of her termination, those illnesses are all routine, short-term illnesses, not covered under FMLA" and noted that other federal courts have reached the same decision. *Id.* (citing cases). However, the plaintiff in *Beaver* did not claim that her ailments were a chronic condition; instead, she relied on another regulation, which provided that a health condition was considered serious if it involved a period of incapacity lasting three or more days and requiring at least two periods of treatment within the first thirty days of incapacity. *See Beaver*,

144 Fed. Appx. at 455 (citing 29 C.F.R. § 825.114(a)[4]). Neither *Beaver* nor any of the cases relied on by *Beaver* analyzed a claim involving recurring, chronic manifestations of a short-term illness. Whether Doris's sinusitis and headaches were severe enough to take them out of the realm of ordinary ailments and into the category of a serious health condition is a question of fact.

Aurora also relies heavily on the fact that many of Doris's claimed illnesses occurred prior to the time he became an "eligible employee" within the meaning of the FMLA. Although Doris had no right to treat any absence prior to December 17, 2008, as qualifying leave under the FMLA, nothing in the FMLA or the interpretive regulations provides that those illnesses must be ignored for purposes of determining whether Doris suffered a qualifying chronic condition during the operative period.

Additionally, Aurora takes issue with what it considers to be Doris's evolving characterization of his medical condition. In his Complaint, Doris alleged that he "suffers from a chronic medical condition that causes debilitating headaches and requires continuing treatment by a health care provider." (Compl. ¶ 12.) This allegation was consistent with a letter sent to Alexandrou by Doris's attorney, stating that Doris had "undergone extensive medical treatment" to address his "chronic condition" and that he had undergone and continued to undergo "medical testing and treatment to identify the cause of the problem and the best course of treatment." (Ex. D. to Compl.) Consistent with these claims, Doris later responded to one of Aurora's interrogatories by stating that

---

[4] The substance of 29 C.F.R. § 825.114(a) is now codified at 29 C.F.R. § 115(a).

he was terminated after providing notification to his supervisors that he was suffering "from debilitating migraine headaches, a chronic condition." (Def. 56.1(a) ¶ 69.)

In his deposition, Doris admitted that he was never diagnosed with debilitating migraine headaches; and it is undisputed that he has not had any treatment for migraines or sinusitis since February 2009. Therefore, he was not currently undergoing "continuing treatment by a healthcare provider" at the time he filed his complaint on June 1, 2009. Nor was he undergoing "medical testing and treatment" at the time his attorney wrote the letter to Alexandrou. Because Doris now asserts that he suffers from a serious health condition of chronic sinusitis (not migraines), Aurora argues that Doris is impermissibly trying to amend his complaint.

However, the relevant issue is whether Doris was undergoing continuing treatment as of the time he took the leave he claims to be FMLA eligible. Moreover, Doris's Complaint allegations regarding his symptoms (debilitating headaches) are not wholly inconsistent with Doris's present theory regarding his diagnosis (sinusitis). Any misrepresentations regarding Doris's condition made in connection with his informal hearing or in his Complaint may be relevant to Doris's credibility and to the factual question of whether he suffered from incapacitating and debilitating headaches that qualified as a serious medical condition under the FMLA, but they are not dispositive of the issue on summary judgment. Doris's testimony and Dr. Krouse's affidavit support Doris's claim that he suffered from debilitating headaches caused by chronic sinusitis. The task of weighing that testimony in connection with other evidence in the case is one that must be left to the jury. *Cf. Price v. City of Fort Wayne*, 117 F.3d 1022, 1023

(7th Cir. 1997) (vacating summary judgment for the defendant and stating that, while the plaintiff's conditions "may not rise to the level of a 'serious medical condition' as a matter of *fact* (a question necessarily left for the finder of fact), they are not barred from doing so as a matter of *law*").

Thus, it cannot be said that sinusitis can never qualify for FMLA leave as a matter of law. Nor can it be concluded that Doris's suffering from this common ailment rose to the level of a serious health condition as a matter of fact in this particular case. Thus, neither party is entitled to summary judgment on Count I.

Additionally, there remains a question of fact as to whether Doris properly notified Aurora of his intent to take FMLA leave. Each party argues that this issue can be resolved conclusively in its favor on summary judgment.

An employee seeking to invoke FMLA protection must provide notice of his or her intent to take FMLA leave. *De la Rama v. Ill. Dept. of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008). Although that notice need not specifically refer to the FMLA, it "must succeed in alerting the employer to the seriousness of the health condition." *Id.* (quoting *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007)). "Calling in sick without providing additional information does not provide sufficient notice under the FMLA." *Id.* (citations omitted). "The FMLA does not require employers to play Sherlock Holmes, scanning an employee's work history for clues as to the undisclosed true reason for an employee's absence." *Id.* When the need for leave is not foreseeable, an employee must notify his employer "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a).

Here, it is undisputed that Doris never specifically invoked the FMLA until after he was notified that Chief Thomas had recommended his termination. Doris's request came in the form of a letter from his attorney more than a week after Doris returned to work following his most recent absence. Doris never consulted the FMLA provisions in the Handbook and never provided any information to Aurora's Human Resources Department about his absences other than statements that he was "sick" and Return to Duty Reports showing he was taking antibiotics and using a nasal spray. Contrary to the representations made by Doris's attorney in her pre-termination correspondence, Doris never provided any medical documentation to Aurora.

The undisputed facts do show, however, that Doris had discussed his condition with multiple direct supervisors; and in the context of labor issues, the knowledge of a supervisor can be imputed to the employer. *Cf. Cunningham v. Gibson Elec. Co.*, 43 F. Supp. 2d 965, 975 (N.D. Ill. 1999) (explaining imputed knowledge under Fair Labor Standards Act); *see also Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 725 (6th Cir. 2003) (reversing summary judgment for employer based, in part, on fact that employee had informed direct supervisor of the accident that caused him to miss work).[5] Evidence in this case shows that Doris's absences were discussed up and down a chain of command from his supervising sergeant all the way to Chief Thomas, who ultimately recommended Doris's termination. Also, Commander Groom's email indicates that issues involving sick time should be "relayed through [the] chain of command."

---

[5] The parties do not sufficiently address the legal question of *who* must be notified for purposes of FMLA leave.

If Doris was indeed suffering from a chronic, serious health condition, a disputed question of fact remains as to whether Doris adequately conveyed the nature of his condition to his supervisors such that Aurora should have been on notice of Doris's FMLA-qualifying condition. Accordingly, both parties' motions for summary judgment as to Count I must be denied for that reason, as well.

### Count II

Doris's retaliation claim is based on the same facts as his interference claim. In Count I, Doris claims that Aurora interfered with his FMLA entitlement by not treating his time off as FMLA leave. In Count II, Doris claims that he was "unceremoniously terminated" after he attempted to exercise his rights under the FMLA by taking time off. (Compl. ¶¶ 31-32.)

The difference between an interference/entitlement theory and a discrimination/retaliation theory is that the latter requires evidence of discriminatory or retaliatory intent, while the former merely requires proof that the employer denied the employee an entitlement under the FMLA. *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) (*Kauffman*). In making out a charge of retaliation, a plaintiff may proceed under the direct or indirect methods of proof. *Burnett*, 472 F.3d at 481. Under the direct method, a plaintiff "must present evidence that his employer took materially adverse action against him on account of his protected activity. *Id.* (citation omitted). Under the indirect method, a plaintiff must "show that after taking FMLA leave (the protected activity), he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a

satisfactory manner." *Id.* at 481-82 (quoting *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006)).

To the extent Doris's claim is based on his being terminated after making an express FMLA request, that claim fails. It is undisputed that Doris did not expressly invoke the FMLA until after he was notified that his termination had been recommended by Chief Thomas. Thus, his subsequent termination was not *because of* his attempt to exercise FMLA rights; it was *in spite of* that attempt. *See Kauffman*, 426 F.3d at 885 (holding that plaintiff presented no evidence of discriminatory or retaliatory animus because his employer terminated him "*in spite of* his rights under the FMLA, not *because* he asserted those rights").

To the extent Doris is simply recasting his interference claim as a retaliation claim, it is duplicative of Count I. The only act of harm to befall Doris was his termination. The undisputed facts show that Doris was terminated for excessive absenteeism. If the disputed issues of fact can be resolved to show that Doris's absences were due to serious health conditions and that Doris's employers were on notice of those conditions, Doris could prevail on his FMLA retaliation claim.

If Doris's termination was unlawful, it matters little whether it is more appropriately construed as an interference with his right to take a leave of absence or as retaliation for taking that leave of absence. The FMLA makes no distinction regarding damages between interference/entitlement and discrimination/retaliation claims. *See* 29 U.S.C. § 2617; *Kauffman*, 426 F.3d at 885 n.1. Therefore, for the same reasons

discussed with regard to Count I, both parties' motions for summary judgment are denied with respect to Count II, as well.

## CONCLUSION

For the reasons discussed above, Aurora's Motion for Summary Judgment and Doris's Motion for Summary Judgment are denied in their entirety.

Date: _August 31, 2010_

JOHN W. DARRAH
United States District Court Judge